Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

August 17, 2026

**BY ECF**

Letter motion denied for the reasons stated on the record at the August 19, 2026 bond hearing.

Dated: August 20, 2026
New York, New York

**SO ORDERED.**

Jennifer Rochon
**JENNIFER L. ROCHON**
**United States District Judge**

The Honorable Judge Jennifer L. Rochon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**RE: United States v. Sash Tharan Balasinkam**
**26 Cr. 282 (JLR)**

Honorable Judge Rochon:

I write respectfully to renew Mr. Sash Balasinkam's request for release on conditions that will allow him to obtain the medical treatment necessary to address his diagnosed mental-health and other medical conditions. Both the Pretrial Services Agency and Magistrate Judge Sarah L. Cave found that there were conditions that could be imposed to reasonably assure the safety of the community and Mr. Balasinkam's return to Court. Newly obtained information only confirms that their positions were correct and that Mr. Balasinkam should be released to receive intensive mental health treatment.

As background, on June 17, 2026, Magistrate Judge Cave ordered Mr. Balasinkam released subject to strict conditions. Order of Release, Ex. A. The Government appealed that order, and the matter was subsequently presented to District Judge Castel, who ordered that Mr. Balasinkam remain detained. Mr. Balasinkam has now spent two months at the Metropolitan Detention Center ("MDC") in Brooklyn. As the newly obtained medical records demonstrate, the circumstances underlying Mr. Balasinkam's detention warrant renewed consideration. Under 18 U.S.C. § 3142(f)(2), a detention hearing may be reopened at any time before trial if the Court finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on whether conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community.

Mr. Balasinkam's current detention followed an acute mental-health crisis that resulted in his involuntary commitment to a Department of Veterans Affairs ("VA") hospital. Court Order for Retention of Patient, Ex. A. That commitment occurred only after Mr. Balasinkam himself

sought treatment from medical professionals. Upon completion of his commitment at the VA hospital, Mr. Balasinkam was taken into custody by federal agents and immediately transferred to MDC, where he has remained detained.

Mr. Balasinkam respectfully renews his request for release under the conditions set forth in Judge Cave's release order, with several additional conditions reflecting the treatment plan developed since that order. Order of Release, Ex. B; Letter of Taylor Eutsey, LMSW, Ex. C. Specifically, Mr. Balasinkam proposes the following conditions of release:

- A $25,000 bond, with his mother, Ann Balasinkam, signing as a financially responsible co-signer, or such other amount as the Court deems appropriate;
- Travel restricted to the Southern and Eastern Districts of New York;
- Pretrial Services supervision;
- Drug testing and treatment as directed by Pretrial Services;
- Mental-health evaluation and treatment as directed by Pretrial Services;
- Enrollment in and compliance with the Montefiore Behavioral Health Center Adult Intensive Outpatient Psychiatric Program, or such comparable intensive outpatient program as the Court or treatment providers deem appropriate;
- Home detention enforced through location monitoring;
- No possession of a firearm, destructive device, or other weapon;
- Ann Balasinkam, to serve as third-party custodian; and
- Weekly check-ins with the Court, if the Court deems them necessary, consistent with Judge Cave's proposed conditions.

Newly obtained medical records provide important new grounds for Mr. Balasinkam's release and identify a significant gap in treatment that can now be addressed. The records were not previously before the Court because counsel received them only after the bail hearings. They provide contemporaneous evidence that, immediately before his arrest, Mr. Balasinkam was experiencing an acute mental-health crisis, sought medical assistance, and was ultimately involuntarily committed to the VA hospital for treatment. The records thus not only provide important context for Mr. Balasinkam's condition during the period of the alleged conduct and the circumstances leading to his arrest, but also demonstrate a need for continued, structured mental-health treatment and an opportunity to address that need through appropriate community-based care upon release.

In light of this new evidence, together with the stringent conditions previously approved by Judge Cave and the proposed additions, Mr. Balasinkam respectfully submits that continued detention is unnecessary and that his request for release warrants renewed consideration.

## I. **Legal Standard**

"A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system." *United States v. Paulino*, 335 F. Supp. 3d 600, 609 (S.D.N.Y. 2018) (Carter, J.) (citation omitted). Consistent with the Eighth Amendment's prohibition on excessive bail, the Bail Reform Act of 1984 ("BRA") "requires a court to order the pretrial release of a defendant on a personal recognizance bond 'unless the court determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'" *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (quoting 18 U.S.C. § 3142(b)). The Second Circuit has emphasized that courts should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987). Where release is appropriate, the BRA requires courts to impose "the least restrictive further condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

The Government bears the burden of establishing that detention is warranted. Where the Government relies on dangerousness, it must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community. *United States v. English*, 629 F.3d 311, 318 (2d Cir. 2011) (citing 18 U.S.C. § 3142(f)(2)); *see also United States v. Brightman*, 2024 WL 1193722, at *2 (S.D.N.Y. Mar. 20, 2024). Thus, detention based on dangerousness is appropriate only where the Government demonstrates that conditions of release cannot reasonably address the identified safety concerns. Where appropriate conditions can reasonably assure the safety of the community and the defendant's appearance, the BRA requires release subject to those conditions.

The BRA requires this Court to independently consider whether any combination of conditions can reasonably assure Mr. Balasinkam's appearance and the safety of the community. *See* 18 U.S.C. § 3142(e), (f). In making that determination, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), including: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person," including, among other things, family ties, employment, financial resources, past conduct, criminal history, and whether the person was on release pending trial; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Mr. Balasinkam should be released pending trial. Critically, newly obtained medical records provide contemporaneous evidence concerning Mr. Balasinkam's mental state immediately before the alleged conduct. The records show that Mr. Balasinkam was experiencing a mental-health episode for which he was involuntarily committed and that, while

experiencing that episode, he actively sought medical assistance. His mother likewise sought assistance on his behalf. These records provide important context concerning the circumstances surrounding the alleged conduct and contain information that was not previously available to the Court.

The newly obtained records also reinforce the central point underlying Mr. Balasinkam's renewed request for release: the circumstances presented here are more appropriately addressed through treatment and structured supervision than continued detention. Mr. Balasinkam has a demonstrated need for ongoing mental-health treatment, which he was receiving immediately before his detention. The records, however, also demonstrate a gap between the level of care Mr. Balasinkam was receiving and the level of treatment necessary to address his needs adequately. His release would provide an opportunity to close that gap through a more comprehensive and structured treatment plan tailored to his current needs. Appropriate conditions—including continued mental-health treatment, home detention, location monitoring, pretrial supervision, and the involvement of his mother as a proposed third-party custodian—can provide meaningful safeguards while ensuring that Mr. Balasinkam receives the level of care and structure necessary to promote his stability and compliance with the Court's conditions.

The BRA does not require detention where conditions can reasonably assure Mr. Balasinkam's appearance and the safety of the community. Here, a comprehensive combination of conditions short of incarceration can address those objectives. Mr. Balasinkam therefore respectfully submits that he should be released subject to appropriate conditions pending trial.

## II. <u>Sash Balasinkam is Not a Danger to the Community</u>

As the Pretrial Services Agency and Judge Cave determined, Mr. Balasinkam should be released because there are conditions that can reasonably assure the safety of the community. Any concerns about dangerousness can be addressed through a combination of treatment, supervision, and restrictions specifically tailored to Mr. Balasinkam's circumstances. The proposed conditions directly address the factors underlying his recent deterioration, including medication management, psychiatric treatment, substance use, and the need for close monitoring when his condition changes.

### A. Newly Obtained Medical Records Show that Mr. Balasinkam was a Veteran in Crisis who Sought Help Before the Alleged Conduct

Mr. Balasinkam is an Army Veteran who served on active duty in the Iraq War from March to August 2003, at the height of the United States's ground invasion and occupation of Iraq, Prior to that, he served on the ground in U.S. military operations in Kosovo in 2001. Certificate of Release or Discharge from Active Duty, Ex. D. He received numerous awards for his service, including the Combat Infantry Badge, designated for infantry soldiers who bravely

fought under hostile enemy fire in active ground combat.[1] Mr. Balasinkam was honorably discharged from active duty in 2004, though he later continued his service in the National Guard. While Mr. Balasinkam is proud of his service, it left him mentally scarred. He has a 100% service-connected disability rating for Post Traumatic Stress Disorder, and he has also been diagnosed with schizoaffective disorder. Records from the VA Hospital corroborate that he has been receiving medical and psychiatric services from the VA Hospital in Manhattan since at least May 2022. Newly obtained medical records, including the excerpts submitted with this motion, provide contemporaneous evidence concerning Mr. Balasinkam's mental state immediately before the alleged conduct that was not previously before the Court. They show that Mr. Balasinkam was experiencing a mental-health crisis, recognized that he was becoming unwell, and repeatedly sought help.

On May 24, 2026, Mr. Balasinkam presented to the emergency department at Concord Hospital and was referred to Riverbend Community Mental Health for further evaluation. Riverbend Medical Records, Ex. E. At 3:29 a.m., he reported "hearing voices today and more than usual." *Id*. He recognized that he was in crisis, sought treatment, and asked to remain at the hospital, but was discharged after being assessed as not meeting the criteria for inpatient treatment at that time. *Id*.

Mr. Balasinkam continued seeking help. He contacted his mother and told her that he was not feeling like himself. His mother contacted the Veteran Crisis Line the following morning, and the records reflect multiple subsequent calls between Mr. Balasinkam and the Crisis Line. During one call, the responder told Mr. Balasinkam, "I am starting to think you need to seek medical attention."[2]

Mr. Balasinkam's condition ultimately required involuntary hospitalization. Court Order for Retention of Patient, Ex. A. He was admitted to the Manhattan VA hospital on May 29, 2026, and remained there through June 17, 2026. A June 2, 2026 court order directed his continued retention as a patient. *Id*. Thus, immediately before his current detention, Mr. Balasinkam was experiencing a documented psychiatric crisis that ultimately required involuntary hospitalization.

Newly obtained VA Hospital records also provide important information regarding Mr. Balasinkam's treatment during this period. He had only begun receiving Invega Sustenna (paliperidone palmitate) at the end of February 2026 and, shortly before the events at issue, reported problems with his medication and its effects. Veteran Affairs Medical Records, Ex. F. [3]

[1] https://www.hrc.army.mil/content/Combat%20Infantryman%20Badge%20CIB
[2] Audio recording from the VA Crisis Line provided to the defense in the July 23, 2026, Discovery Production.
[3] The newly obtained medical records provide a more accurate timeline of Mr. Balasinkam's medication and most recent injections.

Taken together, the submitted records provide important context for the alleged conduct. They show that the conduct occurred against the backdrop of an acute and documented mental health crisis, during which Mr. Balasinkam was repeatedly attempting to obtain help.

**B. Mr. Balasinkam Has a Concrete and Structured Treatment Plan**

Mr. Balasinkam's release would not be based on an unsupported promise that he will remain stable. The Federal Defenders' Social Work Department, through Taylor Eutsey, LMSW, has developed a specific treatment plan addressing both his immediate psychiatric needs and his longer-term stability in the community. Letter of Taylor Eutsey, LMSW, Ex. C. Ms. Eutsey has worked with Mr. Balasinkam for two months, including through in-person visits and regular telephone contact.

It is important to recognize that, although Mr. Balasinkam was receiving services through the VA hospital, he was not receiving the level of care necessary to adequately address and manage his symptoms. The VA services provided an important starting point, but they did not provide the frequency of contact, structure, or sustained care coordination that his psychiatric needs require. As Ms. Eutsey explains, "Mr. Balasinkam has previously received services through the Department of Veterans Affairs; however, that level of care has not provided the frequency of contact, structure, or sustained care coordination his psychiatric needs require. The proposed combination of Montefiore outpatient treatment and longer-term SPOA-supported services offers a more appropriate level of care to promote psychiatric stability, successful reentry, and community safety." Letter of Taylor Eutsey, LMSW, Ex. C.

Upon release, Mr. Balasinkam will be referred to the Montefiore Behavioral Health Center Adult Intensive Outpatient Psychiatric Program in the Bronx. That program will provide psychiatric evaluation and medication management, individual and group psychotherapy, and ongoing monitoring of his symptoms and response to treatment. *Id*. At the same time, Ms. Eutsey will assist Mr. Balasinkam in pursuing placement through New York City's Single Point of Access ("SPOA") system, with the goal of securing longer-term, intensive community-based services, including a Forensic Assertive Community Treatment ("FACT") team. *Id*. As Ms. Eutsey explains, SPOA is "a centralized referral system that connects individuals with serious mental health needs to higher levels of community-based support, including care coordination, intensive case management, and other services designed to promote psychiatric stability and successful functioning in the community." *Id*.

Ms. Eutsey will also meet with Mr. Balasinkam biweekly, assist with medication, access and treatment coordination, and remain in communication with his treatment providers, including the VA hospital. *Id*. This layered plan is designed to ensure continuity of care while

longer-term services are arranged, rather than leaving Mr. Balasinkam to navigate the treatment system on his own.

Mr. Balasinkam has also demonstrated a willingness to seek treatment. When he recognized his condition deteriorating in May 2026, he sought assistance from his mother, medical providers, and the Veteran Crisis Line. He now seeks additional counseling and support and understands the importance of remaining compliant with his medication regimen.

### C. Mr. Balasinkam's Mother Provides an Established and Reliable Safeguard

Mr. Balasinkam's mother, Ann Balasinkam, is prepared to serve as his third-party custodian. The Court need not speculate whether she will recognize and respond to a deterioration in his condition; she has already demonstrated that she will.

During Mr. Balasinkam's May 2026 crisis, she recognized that he was not himself and contacted the Veteran Crisis Line on his behalf. She remains closely involved in his care, lives approximately twenty minutes away by bus, and hopes to resume seeing Mr. Balasinkam on a daily basis following his release. Letter of Ann Balasinkam, Ex. G. As she explains in her accompanying letter, "I personally spoke with the doctor because I wanted to make sure the doctor understood what I was seeing." *Id*. This is precisely the role Ms. Balasinkam proposes to play if Mr. Balasinkam is released: remaining closely involved in his day-to-day care, monitoring his condition, helping ensure that he attends appointments and takes his medication, and communicating concerns to his treatment providers and Pretrial Services.

As third-party custodian, Ms. Balasinkam will provide an additional layer of supervision and will report concerns regarding Mr. Balasinkam's compliance to Pretrial Services and the Court. As she states plainly in her letter, "I am asking the Court to please release my son on bail so that I can care for him, make sure he receives the medical treatment he needs, and help him follow all of the Court's rules." *Id*. Her demonstrated involvement in Mr. Balasinkam's care, combined with her willingness to serve as his custodian, provides the Court with an established and reliable safeguard upon release.

### D. The Weight of the Evidence and Nature of the Alleged Conduct Do Not Warrant Continued Detention

The weight of the evidence and the nature and circumstances of the alleged conduct must be considered in light of the evidence now before the Court. The newly obtained medical records provide contemporaneous evidence of Mr. Balasinkam's mental state immediately preceding the alleged conduct, including his efforts to obtain medical assistance and his subsequent involuntary

hospitalization. This evidence provides important context for evaluating the statements and conduct alleged by the Government.

Mr. Balasinkam does not minimize the seriousness of the allegations. But the Court now has evidence that was not previously before it concerning the circumstances in which the alleged conduct occurred, including evidence that Mr. Balasinkam was experiencing an acute psychiatric episode requiring hospitalization.

Nor does Mr. Balasinkam's recent history demonstrate a pattern of violence toward others or firearm-related conduct. His recent arrests involved property damage and disorderly conduct. He has no history of firearm offenses, does not possess a firearm, and did not obtain one in connection with the conduct alleged here.

### E. Mr. Balasinkam's Recent Arrest History Does Not Demonstrate a Pattern of Violence

The Court should consider Mr. Balasinkam's recent arrest history in context. His arrests in early 2026 occurred during the same period in which his mental-health was deteriorating and his treatment regimen was changing. The underlying conduct in those cases involved primarily property damage and other non-violent offenses, rather than assaults or firearm-related conduct. Mr. Balasinkam was released on his own recognizance or on non-monetary conditions in each of these matters.[4]

This history does not establish a pattern of violence against other people or firearm-related dangerousness. Rather, it reflects a period of escalating psychiatric instability that culminated in Mr. Balasinkam's hospitalization at the VA hospital. Mr. Balasinkam has no history of firearm offenses, does not possess a firearm, and did not obtain a firearm in connection with the conduct alleged here.

### F. The Proposed Conditions Provide Multiple Layers of Protection

The proposed conditions are stringent and directly address the concerns presented. Mr. Balasinkam would be subject to mental-health treatment, medication compliance, drug testing, Pretrial Services supervision, home detention, location monitoring, and third-party custodianship. The Court could also impose weekly check-ins if it deems them appropriate.

---

[4] Mr. Balasinkam was released on his own recognizance with no conditions following each of his prior arrests in early 2026 except his May 25, 2026 arrest in the Bronx. In that case, Mr. Balasinkam was released on May 26, 2026, with non-monetary conditions but was involuntarily committed on May 29, 2026.

Together, these conditions provide treatment, family support, professional supervision, and meaningful restrictions on Mr. Balasinkam's activities. They are designed not merely to supervise Mr. Balasinkam, but to identify and address deterioration before it develops into another crisis. The proposed conditions therefore provide a comprehensive structure for addressing any concerns regarding community safety without the need for continued detention.

## III. Mr. Balasinkam Is Not a Flight Risk

Mr. Balasinkam is not a flight risk. He has no history of failing to appear for court proceedings. He has never been issued a bench warrant and has appeared in Court for his pending state matters, even as he struggled with deteriorating mental health.

Significantly, Mr. Balasinkam has strong and longstanding ties to this community, most importantly his mother, who lives approximately twenty minutes away and sees him every day. He also has established relationships with his medical and mental-health providers in the area and has a concrete treatment plan awaiting him upon release to provide even more stability.

Mr. Balasinkam will also no longer have access to a vehicle upon his release. While detained, he was unable to maintain the payments on his vehicle and ultimately, he agreed to forfeit it. Thus, he no longer has the independent means of transportation he previously had. His ability to travel would be further restricted by the proposed conditions of home detention and location monitoring.

The proposed conditions substantially eliminate any realistic opportunity for flight. Mr. Balasinkam would be required to surrender his travel documents, remain within the Southern and Eastern Districts of New York, and remain on home detention enforced through location monitoring. He would be subject to Pretrial Services supervision, with his mother serving as third-party custodian and reporting any concerns regarding his compliance. He would also be subject to a $25,000 bond, or such other financial condition as the Court deems appropriate.

There is no evidence that Mr. Balasinkam has ever attempted to flee from prosecution, evade the Court, or fail to appear for a required proceeding. To the contrary, his history demonstrates substantial ties to his family, his home, and his treatment providers. Under these circumstances, the proposed conditions are more than sufficient to reasonably assure his appearance.

## IV. Continued Detention at MDC Is Unduly Harsh and Does Not Address Mr. Balasinkam's Treatment Needs

Continued detention at MDC is particularly concerning given Mr. Balasinkam's mental-health needs. Courts in this District have repeatedly recognized the unusually harsh conditions at MDC. *See United States v. Morgan*, 19-CR-209 (RMB) (S.D.N.Y. May 5, 2020) (describing MDC as "terrible" and "deficient" "at [its] core"); *United States v. Chavez*, 22-CR-0303 (JMF) (S.D.N.Y. 2022) (describing conditions as "extraordinarily harsh" and discussing prolonged lockdowns); *United States v. Gonzalez*, 18-CR-669 (JPO) (S.D.N.Y. Apr. 2, 2021) (recognizing the significant hardship imposed by conditions at MDC).

Mr. Balasinkam's own experience further demonstrates why continued detention is not an effective substitute for the structured treatment he requires. Although MDC thus far has administered Mr. Balasinkam's prescribed injections, the remainder of his medication regimen requires him to report to the medication line at designated times and independently obtain and take his medications. In addition to his two prescribed injections, Mr. Balasinkam is prescribed Atorvastatin Calcium 40 mg, Benztropine Mesylate 1 mg, Divalproex 500 mg, Ketoconazole 2% Shampoo, Metformin HCl 1000 mg, Minoxidil 2.5 mg, Terbinafine HCL 1% cream, and Trazodone HCL 50 mg. Balasinkam Active Medication List, Ex. H. The jail's medication-administration system does not provide the individualized support and follow-up that Mr. Balasinkam requires. If he misses a dose of one of these medications, there is no individualized intervention to ensure that the medication is subsequently received or to determine why the dose was missed.

The distinction is significant. For an individual who requires regular medication management, counseling, and monitoring of psychiatric symptoms, simply making medication available at designated times is not equivalent to the individualized treatment and supervision necessary to maintain stability. Mr. Balasinkam's experience therefore underscores the gap between medication administration in a custodial setting and the structured, coordinated treatment plan proposed upon his release.

Since arriving at MDC, Mr. Balasinkam has experienced repeated bullying and targeting by other inmates, and his ability to maintain contact with his primary support system has been impaired. His telephone privileges have been subject to interference by other inmates, at times limiting his calls with his mother to only two or three minutes. He has even asked his mother not to put money on his account because he is concerned that other inmates will take it from him. This is particularly concerning, given that inmates with mental health conditions are significantly more vulnerable to victimization, exploitation, and abuse by other prisoners and staff. [5]

[5] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 57 (2003).

Additionally, Mr. Balasinkam is diabetic. Approximately 9% of incarcerated individuals have diabetes[6], and correctional settings can present significant barriers to effective diabetes management, including rigid meal schedules, limited food choices, delays in medication or insulin administration, and restricted access to glucose monitoring. [7] For Mr. Balasinkam, these limitations provide an additional reason why he would be better able to manage his condition in the community, where he can maintain consistent access to appropriate food, medication, and monitoring.

Continued detention also threatens Mr. Balasinkam's housing. His lease is up for renewal in October, and if he remains detained, he will be unable to renew his lease and could lose his apartment. Losing his housing would create an additional and unnecessary barrier to his successful reentry and psychiatric stability.

For Mr. Balasinkam, continued detention therefore creates additional obstacles to stability while providing none of the individualized, community-based treatment contemplated by the proposed release plan. The question is not whether Mr. Balasinkam requires structure and supervision; he does. The question is whether that structure must be provided through continued incarceration. The proposed conditions demonstrate that it need not be.

## V. Conclusion

Ultimately, the rate of defendants in the S.D.N.Y. incurring a violation while on pre-trial release are incredibly low—merely 14.8%—and the percentage of federal defendants in the S.D.N.Y. who fail to reappear for court are noticeably lower than that at merely 0.9%. [8] These figures underscore that pretrial release, when accompanied by appropriate conditions and supervision, can effectively protect the integrity of the judicial process.

Here, the proposed conditions provide substantial safeguards while directly addressing the circumstances underlying the Government's concerns. In particular, the combination of intensive mental-health treatment, medication management, home detention, location monitoring, pretrial supervision, and third-party custodianship provides a structured framework designed to promote Mr. Balasinkam's stability, ensure his compliance with the Court's orders, and protect the community.

---

[6] Daniel L. Lorber et al., *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 Diabetes Care 544, 544 (2024).

[7] Stephanie Brown, "'Double Punishment': Mass. Inmates and Physicians Fight for Better Diabetes Care in Prisons, Jails," WBUR (June 11, 2026), https://www.wbur.org/news/2026/06/11/massachusetts-prisoners-healthcare-diabetes-insulin-glucose-monitors

[8] *See* U.S. District Courts Pretrial Services Violations Summary Report for 12-Month Period Ending September 30, 2025, Ex. I at 1.

Mr. Balasinkam therefore respectfully submits that these comprehensive conditions can reasonably assure his appearance and the safety of the community, and that continued detention is unnecessary.

Respectfully submitted,

/s/ Zawadi Baharanyi
Zawadi Baharanyi
Assistant Federal Defender
(212) 417-8735/ (917) 612-2753

cc: Corey Baron, Assistant U.S. Attorney.